UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EVERY PENNY COUNTS, INC.,

     Plaintiff,

v.                                  CASE NO.  8:11-cv-2826-T-23TBM

WELLS FARGO BANK, N.A.,

     Defendant.

_____/

**ORDER**

     Challenging the validity of claims 1 and 2 of the '217 patent and claims 4 and 6 of the '849 patent, Wells Fargo moves (Doc. 60) for partial summary judgment on the defense of indefiniteness.  "Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).

*1. '217 Patent – "The Account"*

     Wells Fargo states, "The term 'the account' in claim 1 of the '217 patent renders the claim indefinite because it is impossible to determine whether the account

refers to the customer account, the provider account, both the customer account and

the provider account, or some other account."[1]  (Doc. 60 at 7)

Claim 1 of the '217 patent states:

> A system for accumulating credits from a customer account belonging
> to the customer and managed by an institution and placing the credits
> into a provider account, comprising:
>
> > an information processor; said information processor including
> > a data store with data identifying the customer, the rounding
> > determinant, the managed institution, and the account;
> >
> > said data store including machine readable instructions
> > authorizing the processor to access and read the customer
> > account;
> >
> > said data store including machine readable instructions to
> > calculate rounders after receiving a plurality of payment
> > transactions from the read customer account and to calculate an
> > excess based on the rounders;
> >
> > said data store including machine readable instructions to
> > withdraw the excess from the customer account;
> >
> > said data store including machine readable instructions to
> > transfer the withdrawn excess to the provider account.

'217 patent, col. 18, ll. 11-29.

---

[1] Wells Fargo argues that claim 2 is indefinite because claim 2 "uses ['the account'] in the same way as claim 1." (Doc. 60 at 5) EPC acquiesces by silence. Thus, if claim 1 is invalid for using "the account," claim 2 is invalid. Also, although Count II of the complaint alleges infringement of "one or more claims of the '217 patent" (Doc. 16 at 6), Wells Fargo states that EPC sues for infringement of claims 1 and 2, not 3 or 4, of the '217 patent. EPC again chooses silence, which in litigation unmistakably evinces acquiescence.

Especially for a brief claim, this claim features more than the usual burden of

opaque composition and awkward formatting.  Removing the debris and improving

the formatting yields a more lucid and readable version of the claim[2]:

A system with an information processor, including:

a data store with data identifying:

the customer,
the rounding determinant,
the managed institution, and
the account;

the data store including machine readable instructions:

authorizing the processor to access and read the
customer account;

the data store including machine readable instructions:

to calculate rounders after receiving a plurality of
payment transactions from the read customer
account,
to calculate an excess based on the rounders,
to withdraw the excess from the customer account, and
to transfer the withdrawn excess to the provider
account.

---

[2] The revisions to the original claim 1 are:

A system for accumulating credits from a customer account belonging to the customer and managed by an institution and placing the credits into a provider account, comprising: with an information processor; said information processor including: a data store with data identifying:  the customer, the rounding determinant, the managed institution, and the account; said the data store including machine readable instructions: authorizing the processor to access and read the customer account; said the data store including machine readable instructions: to calculate rounders after receiving a plurality of payment transactions from the read customer account, and to calculate an excess based on the rounders; said data store including machine readable instructions to withdraw the excess from the customer account; and said data store including machine readable instructions to transfer the withdrawn excess to the provider account.

Wells Fargo argues that "the account," which appears in sub-paragraph 1 of claim 1, lacks an antecedent and has "at least four equally plausible interpretations" – the customer account, the provider account, both accounts, or some other account.  (Doc. 60 at 8)  EPC argues that "the account" means the customer account because "'the account' is listed as one of several items that are identified by data alongside 'the customer.'"  (Doc.  65 at 3)  Also, EPC argues (1) that because the term "the account" is singular, "the account" cannot mean "the accounts" and (2) that "the account" cannot denote a third account because of the preference for construing a claim to sustain validity.

"The requirement of antecedent basis is a rule of patent drafting . . . , [but] the failure to provide explicit antecedent basis for terms does not always render a claim indefinite."  *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).  Instead, in "the absence of explicit antecedent basis . . . [,] the scope of a claim [must] be reasonably ascertainable by those skilled in the art."  *Energizer Holdings*, 435 F.3d at 1370 (construing *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001)).  At least some reason exists for one skilled in the art both to believe and to doubt that "the account" means either "the provider account" or "the customer account" or "another account" or "the accounts."

As stated earlier, EPC argues that "the account" "clear[ly]" means "the customer account" because "the account" is listed as one of several items that are

identified by data alongside 'the customer.'"  (Doc.  65 at 3)  In full, the list states,
"data identifying the customer, the rounding determinant, the managed institution,
and the account."  '217 patent, col. 18, ll. 16-18.

Claim 1 lists "data identifying the customer" as the first element of the data
store and lists "data identifying . . . the account" as the fourth element of the data
store.  Because – especially in reference to a bank (or any institution maintaining a
customer account) – the customer's account number is the unique, proprietary, and
captive means of positively identifying the customer and because the customer's
account number is invariably essential to the conduct of any financial transaction
within a bank, the phrase "data identifying the customer" is at least sufficient to, and
with reference to a bank almost certain to, encompass "data identifying the
[customer] account."  Stated differently, the phrase "data identifying the customer,"
when the phrase is used in reference to a bank, is preemptively more likely to include
the customer's account number than to include the customer's post office box
number, residence address, office address, telephone number, driver's license
number, credit card number, Social Security number, e-mail address, or some other
"identifying" datum.  Although each datum is to some extent "identifying" and
although each datum is to a bank perhaps intermittently useful, only one datum – the
customer's bank account number – is assigned to the customer originally by the bank
and is, therefore, verifiable by the bank without reliance on a report by either the
customer or a third party.  And only one datum – the customer's bank account

number – is created, assigned, maintained, governed, deployed, verified, and, if necessary, altered or replaced (or even withdrawn) by the bank.  In the context of the term's use in connection with a bank, by far the most persuasive and probable interpretation of the phrase "data identifying the customer" includes the customer's account number.

But, if "data identifying . . . the customer" means "data identifying the customer account," interpreting the phrase "the account" to mean "the customer account" renders the phrase "the account" redundant of "data identifying . . . the customer."  An interpretation resulting in a conspicuous redundancy is disfavored.

Mentioned in the specification and elsewhere in the patent, including in the claim, a "provider account" is another account toward which the phrase "the account" might point.  Both Figure 2's depiction of the data store and the specification's discussion of the "data storage" (a term synonymous with "data store") include a "charity account," which is a "provider account" established for the benefit of a charity.  "[T]he account" might mean a provider account, whether charitable or otherwise, to which the money diverted from the customer account is destined.  Perhaps the best argument that "the account" means "the provider account" is that within the patent "the provider account" is the most readily available and accessible alternative to "the customer account" (which interpretation is disfavored as a redundancy).

An additional hypothesis is that "the account" means either "the customer account or the provider account" or "the customer account and the provider account."  In the latter case ("the customer account and the provider account"), "the account" necessarily (or, at least, correctly) becomes "the accounts" (plural), which suggests that "the account" is a typographical error, for the probable occurrence of which the balance of this patent repeatedly provides ample and graphic evidence.

In response to the interpretation of "the account" as "the accounts," EPC argues that the patentee understood how to use an "s," employed an "s" if and only if an "s" was intended, and excluded an "s" when no "s" was intended. Nonetheless, "the account" might lack an "s" because of a scrivener's error and not because the drafter used "the account" and "the accounts" interchangeably, which is implausible.  The patent is infested with scrivener's (and other) errors, and the prospect of a missing "s" fits comfortably within the patterns discernible in the patent.  For example, the patent states, "The actual transfer . . . concludes with the [transfer of] funds to each listed PC (provider account) . . . ." '217 patent, col. 3, ll. 34-38.  "PC" is used nowhere else in the patent, and the patent later clarifies that "PA" is the intended acronym for "provider account(s)." '217 patent, col. 17, l. 25 (stating, "provider accounts (PA)").[3]  But even the creation of the correct acronym, "PA," is tardy – by the time the patent defines the acronym, the patent has already

_____

[3] For no discernible reason, the patent lists some acronyms before the full words (e.g., "PC (provider account)") and some after (e.g., "provider accounts (PA)").

deployed either "provider account" or "provider accounts" four times and "PA"
twelve times.  And after the "PA" acronym is created, the patent no longer uses the
acronym but uses "provider accounts." '217 patent, col. 17, l. 30.  In other examples
of error, the patent bungles nearly every acronym,[4] conflates "i.e." and "e.g.," and
writes "invention invention," "FIG. 7A" (not "FIG. 7" – no figure 7A exists),
"FIG. 4B" (although Figure 4B exists, "FIG. 4C" is intended),[5] step "8120" (not
"120"),[6] "2 $300.14" (not "$300.14"), "pa id" (not "paid"), "saving s," and "piece s."
These errors – which say nothing of the drafter's grammatical and syntactical
incompetence and bemusing judgment[7] – confirm that "account" lacking an "s" by
mistake accords with the level of compositional adroitness and dexterity that
pervades the patent.

    In sum, as used in claims 1 and 2, the phrase "the account" lacks definiteness.
"[T]he account" might mean "the customer account," "the provider account," or

---

[4] "SP" randomly means either "subscriber" or "subscriber/payor" or
"subscriber/subscribers."  The "SP" acronym is created four times, two of which are in the same
paragraph. The "MC," "CMS," and "PIN" acronyms are each created twice. The "CCC" acronym
is created four times. The "PMS" acronym is created twice. The "PS," "ACH," and "BC" acronyms
are created yet never used. The "EDI" acronym is (twice) created to stand for "Electronic Data
Interface" and is (once) created to stand for "Electronic Data Interchange." And many acronyms,
for example, "CS," are created (several times) without surrounding parentheses.

[5] In the same paragraph, this error occurs twice. '217 patent, col. 7, ll. 64, 67.

[6] '217 patent, Fig. 4A.

[7] For example, the drafter chose "PMS" as an acronym.

"the accounts,"[8] or otherwise; no informed and confident choice is available among the contending definitions.

However, a somewhat indefinite term, depending on the centrality of the term to the claim, is not necessarily equivalent to a fatally indefinite claim. As stated by one leading commentator:

> [Section 101] is said to require that the patent claim be definite. Definiteness in this sense means that the language of the claim must, on its face, make the technological scope of patent protection reasonably clear. Cases state that a patent claim is sufficiently definite when a person skilled in the art is able to determine, from reading the claim, the boundaries between the activities that are called out as covered by the patent right and those that are not.
>
> . . . .
>
> This having been said, however, it should be noted that the cases do not require this notice to be communicated with absolute precision. Rather, because patent claims employ language, they are inherently ambiguous at some level. A patent claim will therefore delineate the exact boundary between controlled and uncontrolled activities only rarely. Thus, instead of calling for such exactness, the definiteness requirement is best understood as insisting that the applicant describe the limits of the protected subject matter only so far as is reasonably possible. . . . [T]he claim is said to need only make the scope of the control "reasonably" clear.

R. Carl Moy, *Moy's Walker on Patents* § 4.94  4–298 to 300 (Thomson/West 2006).

The sources for the resolution of ambiguity in a claim include resort to either or both of the specification (of which the claim is a part) and the prosecution history. The familiar decisional precedent, perennially groping for a less indefinite definition

---

[8] Presumably, had the claim stated "the accounts" the term would mean "the customer account and the provider account." But that is not clear; "the accounts" might mean "charity accounts" or "other accounts" or even "sub-accounts" or some unstated combination of the three.

of "indefinite," requires that to invalidate a claim for "indefiniteness" the district court must determine that, clearly and convincingly and contrary to the presumption of validity, the claim is "insolubly ambiguous" and "not amenable to claim construction."  As summarized aptly in *DDR Holdings, LLC v. Hotels.com*, ___ F. Supp. 2d ___, 2013 WL 3187161, at *3 (E.D. Tex. 2013) (Gilstrap, J.):

> A finding of indefiniteness must overcome the statutory presumption of validity. That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area."

(citations omitted)

The '217 patent is a notably simple (although vexingly composed) patent that addresses a notably simple subject – an authorized movement of money from one account to another account after a simple mathematical computation.  Although the entire patent is awkwardly drafted, the oppugned claim is simple.  The specification is simple.  The drawings are simple.  The patent as a whole, notwithstanding the deficiencies, seems understandable; the claim seems understandable.  In short, the indefiniteness of the term "the account" leaves no unmanageable gap in the information available for determining the scope of the claim.  No practical incapacity or disabling uncertainty appears as a consequence of the fact that "the account" might mean one thing or the other.  In sum, the extent of the indefiniteness in the term "the account" is inconsequential and falls far short of the "insoluble ambiguity" required to invalidate the claim.

An instructive contrast is *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, ___ F.3d ___, 2013 WL 3836240 (Fed. Cir. 2013), which invalidates for indefiniteness a claim in which the term "molecular weight" was subject to three measures, each of which yielded a different result in the manufacture of a pharmaceutical. Resort to the specification failed to clarify the ambiguity, and the claimed pharmaceutical was unknowable without the precise method of determining molecular weight.

In the '217 patent no such unresolvable and consequential ambiguity exists and no such insurmountable obstacle to understanding the claim arises. For example, at column 5, line 35 through line 38, the patent states that "the data storage DS contains individual storage for charity accounts CA and other accounts OA, such as for banks, etc. all with ledgers for individual customers." Column 12, beginning at line 41, states:

> If the PIN number is correct and thereby qualified, the CC in step 518 lists the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop processing rounder transactions), the vehicles used for processing and depositing, e.g., checking account & ATM terminals, debit card use, and credit card use, names and addresses of all sub-accounts (savings, investing, and charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%. In step 520 it asks the subscriber to list all accounts to be eliminated or modified, if any.
>
> In step 522 the CC asks the subscriber if there are any new accounts to add.
>
> If the answer is no, the computer goes to step 526 to write an updated rounder account file. If yes, the CC then proceeds to step 524, and asks

> the subscriber to enter any new accounts according to the rounder number or percentage that is applied to each account entry ($1, $3, 2%, etc.), stop orders (when to stop future processing), the vehicles used for processing and depositing, (e.g., checking accounts & ATM terminals, debit card use, and credit card use), names and addresses of all sub-accounts (savings, investing, and/or three charitable choices), and the percentage of the rounder transaction assigned to each sub-account for a cumulative total of 100%.

The patent uses "the account" in an "including" clause, which demonstrates that the data store contains elements not listed. Whichever (of the many) elements "the account" denotes is inconsequential. A reader of the patent – using the claim and the specification, the parts cited above and others – is able to adequately understand the contents of the data store and the claim as a whole. In short, the claim is not "insolubly ambiguous" and remains amenable to claim construction.

*2. '217 Patent – "Managed Institution"*

Wells Fargo argues that the use of "the managed institution" in claim 1 of the '217 patent is indefinite. The patent uses "managed institution" only twice – once in claim 1 and once in the abstract. The uses are nearly identical, and neither use includes an explanation of the term. Instead, "data identifying . . . the managed institution" is listed as an element of the data store. The abstract states, "The system includes an information processor including a data store with data identifying the customer, the rounding determinant, the managed institution, and the account." Similarly, claim 1 states that the data store includes "data identifying the customer, the rounding determinant, the managed institution, and the account."

EPC argues that "the managed institution" is the "institution that provides and maintains [the] customer account." (Doc. 63 at 8)  EPC cites claim 1 and the abstract, each of which identifies – before the first use of the phrase "the managed institution" – "a customer account belonging to the customer and managed by an institution."  EPC argues that "there must [] be an institution that provides and maintains the customer account that is managed." (Doc. 65 at 5)

The immediate problem with EPC's argument is that an institution engaged in "managing" something is logically, grammatically, and typically called a "managing institution" (that is, an institution that manages); a "managed institution" is logically, grammatically, and typically understood as an institution subject to managing by another (that is, an institution that is managed).  To call one by the name of the other is extraordinarily awkward and unnatural.  In short, in reference to a phrase describing an account that is "managed by an institution," the "institution" is readily and understandably designated as "the managing institution" but strains mightily under the designation "the managed institution."

Wells Fargo argues that "the managed institution" means either "the institution that provides and maintains the provider account" or "the institution that provides and maintains the customer account" and argues that each is equally plausible.  Wells Fargo cites portions of the specification that refer to both as "institutions."  '217 patent, col. 10, ll. 61-66 ("In step 447 [the computer] determines if the account, in the form of a charity, merchant, or institution, is in the list of

- 13 -

charities or institutions that have been accepted by the system.  If the answer is no, the computer in step 448 asks if the consumer wishes to have a temporary account set up for that donee or institution pending investigation."); col. 12, ll. 1-4 ("The excess funds that are created by the rounder system can be held internally by the bank or credit institution or assigned to other providers for the purchase of mutual funds, annuities, bonds, travel services, merchandise, etc."); col. 12, ll. 13-16 ("The subscriber/subscriber's [sic] account instructions will then be applied by the institutions' central computers (CC) to provide excess funds.").  However, the only support proffered by Wells Fargo that describes the manager of the provider account as an "institution" – column 10, lines 61-66 – is in the first embodiment of the invention, which the parties agree is not the subject of this action.  In the second embodiment – the embodiment that is the subject of this action – each use of "institution" describes the manager of a customer account.  *See also* '217 patent, col. 11, ll. 27-31 ("In FIG. 7 Level 1 a subscriber (SP) makes an exact payment using a check, credit or debit card and tenders the draft to a payee on Level 2 who in turn deposits the draft for customary authorization, approval, and payment by Level 3 Account Managers (AM) (as in banks or credit institutions).").  Also, the manager of the customer account provides the only "managing" that the second embodiment discloses.  '217 patent, col. 11, ll. 39-41 (explaining that an "account manager" will "manage the funds and make distributions"); col. 13, ll. 24-26 ("[B]ank central computers . . . collect funds, manage funds internally[,] and [] disburse funds.");

- 14 -

col. 15, ll. 23-25 ("[C]ard issuers central computers . . . collect funds, manage funds internally[,] and [] disburse funds."). Thus, fairly and disinterestedly construed, the patent informs the reader that the manager of the customer account, not the provider account (which the second embodiment never describes as either "managed" or "managing"), is the "managed institution."

Although the phrase "the managed institution" is awkward, the claim and the specification permit an adequate understanding of the term and the claim. The claim is not "insolubly ambiguous" and remains amenable to claim construction.

*3. '849 Patent – "Total Rounder Amount"*

Wells Fargo argues that the '849 patent's use in claims 4 and 6 of "total rounder amount" is indefinite. Wells Fargo explains that, although "rounder amount" is defined, the patent fails to demonstrate how a "total rounder amount" (a term that is never used in the specification) is calculated. Wells Fargo argues that "total rounder amount" "could refer to the sum of a plurality of 'rounder amounts' calculated in connection with each of a plurality of individual payment transactions . . . [or] to a single rounder amount generated based on the sum of a plurality of transaction amounts."[9] (Doc. 60 at 12) Accordingly, the issue is whether one skilled in the art could determine whether "total rounder amount" means the sum of several

---

[9] Wells Fargo argues that "[t]here are multiple other possible definitions" but proffers no more. (Doc. 60 at 12) No other definition seems reasonable.

rounder amounts or a single rounder amount calculated from the sum of several transaction amounts.[10]

"Total rounder amount" is not "insolubly ambiguous." "Total" modifies "rounder amount" and persuasively implies that rounder amounts, not transaction amounts, are totaled (i.e., added). In the second proposed definition, the total rounder amount is a rounder amount calculated by totaling transaction amounts, not rounder amounts. Accordingly, "total rounder amount" is not indefinite and means "the sum of rounder amounts."

## CONCLUSION

Wells Fargo's motion for partial summary judgment for indefiniteness (Doc. 60) is **DENIED**.

ORDERED in Tampa, Florida, on March 5, 2014.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[10] For example, suppose a customer's transaction amounts are $1.49 and $1.50. Using the first definition, the total rounder amount equals the sum of $0.51 and $0.50, or $1.01. Using the second definition, the sum of the transaction amounts is $2.99, which gives a total rounder amount of $0.01.