UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EVERY PENNY COUNTS, INC.,

    Plaintiff,

v.                                                 CASE NO.: 8:11-cv-2826-T-23TBM

WELLS FARGO BANK, N.A.,

    Defendant.
_____/

**ORDER**

Every Penny Counts (EPC) sues (Doc. 16) Wells Fargo for infringing U.S. Patents 7,571,849 and 8,025,217. A *Markman* order (Doc. 96) construes each patent's claims, but EPC moves (Doc. 108) for reconsideration. Also, challenging each patent's validity, Wells Fargo moves (Doc. 68) for summary judgment under 35 U.S.C. § 101.

**BACKGROUND**

Described elsewhere in this action (e.g., Docs. 95 and 96), the '849 and '217 patents – using long sections of identical text – claim, respectively, a method of and a system of automated saving or automated charitable giving. The patented inventions are easily illustrated. For example, the dollars and cents amount of a bank customer's credit card purchase is "rounded up" to the next whole dollar. The difference between the dollars and cents amount of the purchase and the next whole

dollar, to which the amount is "rounded up," is withdrawn from the customer's bank account and deposited into a recipient account for personal saving or charitable giving. Conversely, if a participating customer deposits money, the dollars and cents amount of the bank customer's deposit is "rounded down" to the next dollar, and the difference is directed to the recipient account.

A March 18, 2014, *Markman* order (Doc. 96) construes the '849 and '217 patents to claim only the rounding method of contributing to a recipient account. However, in a motion for reconsideration, EPC argues that the patents claim two additional methods of contributing to a recipient account – the additur and percentage methods. Under the additur method, a fixed amount is contributed to the recipient account for each transaction. Under the percentage method, a fixed percentage of each transaction amount is contributed to the recipient account. Because this order grants summary judgment in favor of Wells Fargo and because this order is unaffected by construing the patents in accord with EPC's interpretation, this order assumes (although deciding otherwise) that EPC's patents claim all three methods of contributing to a recipient account – rounding, additurs, and percentages.

However construed, EPC's inventions are a computerized application of a technique known from antiquity in which a small saving on many occasions accumulates into a large saving. By distributing costs and concentrating benefits, a series of nearly unnoticed deductions aggregate to a noticeable accretion.

Because the costs are difficult to detect, the method is sometimes deployed as a scam, much earlier in the form of "coin clipping" in which a minuscule, inconspicuous portion of a coin is furtively clipped from many coins.  *See* William Blackstone, *Commentaries on the Laws of England*, Vol. 4, p. 86 (1769) ("[B]etween the reign of Henry the Fourth and Queen Mary, . . . the spirit of inventing new and strange treasons was revived: among which we may reckon the offences of clipping money . . . ."); *see also* Sidney Sherwood, *The History and Theory of Money* 70 (1893), *available at* http://books.google.com/books?id=Q0USAQAAMAAJ&source=gbs_navlinks_s (describing clipping and "sweating," a similar method of debasing a currency).[1]  More recently, in the 1983 film *Superman III*, Gus Gorman, played by Richard Pryor, utilizes the coin clipping concept after discovering that each of his co-worker's earnings includes a fraction of a cent.  Gorman programs a virus to round each paycheck down to the nearest cent and to deposit the fractional difference into a recipient account.[2]

More than a scam, the technique has long existed as a legitimate practice.  For example, governments have collected revenue for millennia through a sales tax or an

---

[1] In 1696, the Royal Mint famously hired Sir Isaac Newton to solve the problem of "coin clipping," which he famously solved. *Isaac Newton*, http://www.royalmintmuseum.org.uk/history/people/mint-officials/isaac-newton/ (last visited Sept. 10, 2014).

[2] Similarly, in the 1999 film *Office Space*, three employees of Initech, a fictional company, steal several hundred thousand dollars after discovering that each of Initech's countless business transactions includes a fraction of a cent. The employees program a virus to round each transaction down to the nearest cent and to deposit the fractional difference into a recipient account. The program works but contains a misplaced decimal that rounds each transaction down to the nearest dollar, not the nearest cent – with alarming results.

excise tax, each of which directs either a percentage of a transaction amount or a fixed amount into a recipient account. Similarly, since no later than the Great Depression of the 1930s, employees have created "Christmas Clubs" to save money for Christmas purchases. Throughout the year, an employee with a Christmas Club deducts from each paycheck a small amount, determined by whatever method the employer offers and the employee selects, and deposits the deduction into a recipient account. By the end of the year, the small, manageable, periodic sacrifices amount to a useful saving for purchasing Christmas gifts.

**PRECEDENT**

Limiting the subject matter of a patent-eligible invention, Section 101 of the Patent Act states, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." Section 101 excludes from patent protection a law of nature, a natural phenomenon, and an abstract idea. The Supreme Court has decided four recent actions under Section 101 and invalidated all but one claim in the patents considered.[3]

---

[3] *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107 (2013), the only recent Supreme Court decision decided under Section 101 that upheld a claim, pertains to a natural phenomenon. *Myriad* upholds a claim directed to "synthetically created" DNA but invalidates the claims directed to naturally existing DNA.

In *Bilski v. Kappos*, 561 U.S. 593, 130 S. Ct. 3218 (2010), the patentee's first claim, a method for hedging risk, comprised (1) "initiating a series of financial transactions between providers and consumers of a commodity," (2) "identifying market participants that have a counterrisk for the same commodity," and (3) "initiating a series of transactions between those market participants and the commodity provider to balance the risk position of the first series of consumer transactions." *Alice Corp. Pty. v. CLS Bank International*, 134 S. Ct. 2347, 2356-57 (2014) (summarizing *Bilski*). In Claim 4, the patentee claimed the mathematical formula for the method described in Claim 1, and in the remaining claims the patentee limited the hedging technique in Claim 1 to energy and commodity markets.

*Bilski* invalidates each claim in the patent as an abstract idea. *Bilski* discusses in detail the law of Section 101 but applies the law only in two paragraphs. *Bilski* invalidates Claims 1 and 4 because the hedging described in the claims is a "basic concept . . . [and] fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." 130 S. Ct. at 3231. Thus, upholding Claims 1 or 4 "would effectively grant a monopoly over an abstract idea." 130 S. Ct. at 3231. For the remaining claims, *Bilski* holds that "limiting an abstract idea to one field of use or adding token postsolution components d[oes] not make [a] concept patentable." 130 S. Ct. at 3231. Accordingly, *Bilksi* invalidates the claims as an "attempt to patent the use of the abstract idea of hedging risk in the energy market

- 5 -

and then [to] instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation." 130 S. Ct. at 3231.

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012) – another recent Supreme Court opinion decided under Section 101 – invalidates a patent on calibrating a drug dosage based on a blood reading. The patent instructs a doctor to "(1) measure (somehow) the current level of the relevant metabolite, (2) use particular . . . laws of nature (which the claim sets forth) to calculate the current toxicity/inefficacy limits, and (3) reconsider the drug dosage in light of the law." *Mayo*, 132 S. Ct. at 1299. The natural law discovered by the patentee – a correlation between the concentration of certain metabolites in the blood and the proper dosage of the drug – is, perhaps, abstruse and newly discovered (especially compared to the abstract idea in this action), but *Mayo* holds that the discovery is an unpatentable natural law. Similarly, the application of the natural law – measuring metabolite levels in the blood and "reconsidering" the drug dosage – is unpatentable because the application "add[s] nothing specific to the laws of nature other than what is well-understood, routine, conventional activity, previously engaged in by those in the field." *Mayo*, 132 S. Ct. at 1299.

*Alice Corp. Pty. v. CLS Bank International*, 134 S. Ct. 2347 (2014) – the Supreme Court's most recent and most applicable decision – invalidates a patent "drawn to the abstract idea of intermediated settlement." The patent contains method and system claims. The "representative" method claim comprises:

- 6 -

> (1) "creating" shadow records for each counterparty to a transaction; (2) "obtaining" start-of-day balances based on the parties' real-world accounts at exchange institutions; (3) "adjusting" the shadow records as transactions are entered, allowing only those transactions for which the parties have sufficient resources; and (4) issuing irrevocable end-of-day instructions to the exchange institutions to carry out the permitted transactions.

*Alice*, 134 S. Ct. at 2359.

*Alice* cites *Mayo* and identifies a two-step analysis required under Section 101:

> First, . . . determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so . . . , then ask, "what else is there in the claims . . . ?" To answer that question, . . . consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.

*Alice*, 134 S. Ct. at 2355.

Applying step one, *Alice* holds that the patent claims an abstract idea that is not "meaningful[ly]" distinguishable from the risk hedging in *Bilski*. Without "labor[ing] to delimit the precise contours of the 'abstract idea' category," *Alice* explains that intermediated settlement is a "building block of the modern economy" and a "fundamental economic practice long prevalent in our system of commerce." 134 S. Ct. at 2356-57.

Applying step two to the method claims, *Alice* states that "the relevant question is whether the claims . . . do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer." 134 S. Ct. at 2359. *Alice* finds that each step of the claimed method is "purely conventional." "In short, each step [of the method claims] does no more than

require a generic computer to perform generic computer functions." *Alice*, 134 S. Ct. at 2359. Also, analyzed "as an ordered combination," the steps of the method "add nothing that is not already present when the steps are considered separately"; instead, the steps of the method "simply recite the concept of intermediated settlement as performed by a generic computer." *Alice*, 134 S. Ct. at 2359. The system claims fail step two for "substantially the same reasons." The system claims recite the unpatentable method implemented by a "generic computer," which is composed of a "handful of generic computer components," including a "data processing system" with a "communications controller" and a "data storage unit." *Alice*,134 S. Ct. at 2360. Accordingly, neither the method claims nor the system claims in *Alice* are patentable.[4]

**DISCUSSION**

*1.* Alice*'s Two-Step Analysis*

As a first step, *Alice* instructs the district court to determine whether the concept that each patent is "directed to" or "drawn to" is a patentable concept. 134 S. Ct. at 2355. The '849 and '217 patents are "directed to" or "drawn to" the

---

[4] *WildTangent, Inc. v. Ultramercial, LLC*, 2014 WL 2921707 (U.S. June 30, 2014), grants a petition for certiorari, vacates the Federal Circuit's opinion, and remands the action "for further consideration in light of *Alice*." *Bancorp Services., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 2014 WL 2921725 (U.S. June 30, 2014), and *Accenture Global Services., GmbH v. Guidewire Software, Inc.*, 2014 WL 348249 (U.S. June 30, 2014), decline petitions for certiorari. Conspicuously, the Supreme Court vacated the only Federal Circuit opinion, *Ultramercial*, upholding a software patent and declined certiorari over the two actions, *Bancorp* and *Accenture*, that invalidate software patents.

concept of routinely modifying transaction amounts and depositing the designated, incremental differences into a recipient account.[5] Like the intermediated settlement claimed in *Alice* (and th0e risk hedging claimed in *Bilski*), the concept claimed in the '849 and '217 patents is a "basic concept" and a "fundamental economic practice long prevalent in our system of commerce" and, hence, an abstract idea. *Alice*, 134 S. Ct. at 2356. As discussed above, economic actors of every description and every motive – from the scam artist to the frugal wage-earner to the government – have understood and exploited the elemental notion of regularly and frequently capturing a small and inconspicuous quantity and segregating and retaining the captured quantities until the quantities accumulate into a large quantity – a program indebted only and entirely to the fundaments of elemental arithmetic – simple addition.

Because the '849 and '217 patents are "directed to" an abstract idea, step two of *Alice* applies. "At . . . step two, [the district court] must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application," which requires "more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357.

---

[5] The patents in this action describe an abstract idea that lacks a convenient, catchy moniker, such as *Bilski*'s "risk hedging" or *Alice*'s "intermediated settlement." Perhaps the moniker most precisely identifying the present patent is "salami slicing." *See Larios v. Nike Retail Servs., Inc.*, 2013 WL 4046680 (S.D. Cal. Aug. 9, 2013) (Curiel, J.) (defining "salami slicing" as the method of "remov[ing] something gradually by small amounts at a time").

The '849 patent's "representative" method, *Alice*, 134 S. Ct. at 2359, comprises (1) electronically receiving data, including the transaction amounts,[6] (2) modifying the transaction amounts in accord with a formula, (3) depositing the differences between the modified and unmodified transaction amounts into one or more recipient accounts, and (4) adjusting each account balance accordingly. The function performed by the computer at each step of the method is "purely conventional." *Alice*, 134 S. Ct. at 2358. The first two steps – (1) electronically receiving data (or, in the words of *Alice*, "us[ing] a computer to obtain data") and (2) rounding, or adding a percentage or fixed number – are "well-understood, routine, conventional activities previously known to the industry." *Alice*, 134 S. Ct. at 2359 (internal quotation marks omitted). "The same is true with respect to [steps three and four,] the use of a computer to . . . adjust account balances . . . ." *Alice*, 134 S. Ct. at 2359. Also, by adding "nothing significantly more than an instruction to apply the abstract idea . . . using some unspecified, generic computer,"[7] the four steps of the method are not "'enough' to transform an abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2360.

---

[6] Claim 1 of the '849 patent lists the other data received – "a determinant, apportioning data, payment transaction data comprising a transaction amount, and operating account identifying data that identifies an operating account."

[7] The claims offer no description of the computer, and the specification offers no description beyond the generic, undefined name "clearinghouse central computer" or, sometimes, "central computer."

- 10 -

Like the '849 patent (i.e., the method patent), the '217 patent's invention is not patentable. The '217 patent claims a system that implements – on a generic computer – the '849 patent's method. Like the computer in *Alice*, the computer in the '217 patent contains a "handful of generic components" – specifically, the '217 patent's computer comprises a "data store," an "information processor," and a "communicator." These components, two of which are discussed in *Alice*, are fundamental to every computer. *See Alice*, 134 S. Ct. at 2360 ("Nearly every computer will include a 'communications controller' and 'data storage unit' capable of performing . . . basic calculation, storage, and transmission functions . . . ."). "As a result, none of the hardware recited by the system claims offers a meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers." *Alice*, 134 S. Ct. at 2360.

In sum, the '849 patent, a method patent, is invalid under Section 101 because the patent claims an abstract idea that is implemented by "well-understood, routine, conventional activities previously known to the industry." *Alice*, 134 S. Ct. at 2359. Similarly, the '217 patent, a system patent, is invalid under Section 101 because the patent merely implements – on a generic, unspecified computer – the '849 patent's (unpatentable) method.

*2.* Bilski*,* Mayo*, and Other Precedent*

Although *Alice* controls and shows that the '849 and '217 patents are invalid, *Bilski*, *Mayo*, and other precedent further supports invalidating the '849 and '217 patents. Like the hedging in *Bilski*, modifying each transaction amount and depositing each difference into a single account is a "basic concept . . . [and] fundamental economic practice long prevalent in our system of commerce." Upholding the claims of the '217 and '849 patents "would effectively grant a monopoly over an abstract idea." Also, like the patents in *Bilski* (which contained claims limited to the commodity and energy markets), the '849 and '217 patents are invalid despite the patents' "limiting [the] abstract idea to one field of use" – credit or debit card transactions. 130 S. Ct. at 3231; *accord Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) (invalidating, under Section 101, a patent despite the patent's "attempt[] to limit the abstract concept to a computer implementation and to a specific industry"), *cert. denied*, 2014 WL 348249 (U.S. June 30, 2014).

Section 101 applies to the abstract idea in the '849 and '217 patents even more than Section 101 applies to the invention in *Mayo*. The natural law in *Mayo* – a correlation between the concentration of certain metabolites in the blood and the proper dosage of a drug – is more novel than routinely modifying transaction amounts and depositing the differences into a recipient account. And, like the claims in *Mayo*, the claims in the '849 and '217 patents "d[o] not differ significantly from a

- 12 -

claim that just said 'apply the algorithm.'" *Mayo*, 132 S. Ct. at 1301.  In other words, the claims "add nothing specific to [EPC's abstract idea] other than what is well-understood, routine, conventional activity, previously engaged in by those in the field." *Mayo*, 132 S. Ct. at 1299.

## CONCLUSION

EPC's motion for reconsideration is **DENIED**.  Wells Fargo's motion (Doc. 68) for summary judgment is **GRANTED**.  Under Section 101, the '849 and '217 patents are invalid.  Because both patents are invalid under Section 101, Wells Fargo's motion (Doc. 106) for reconsideration is **DENIED AS MOOT**.  The clerk is directed to enter judgment in favor of Wells Fargo and against EPC, to terminate any pending motion, and to close the case.

ORDERED in Tampa, Florida, on September 11, 2014.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE